**CPG PRODUCTS CORPORATION, Appellee,**

v.

**PEGASUS LUGGAGE, INC., Appellant.**

**Nos. 84–866, 84–880 and 84–972.**

United States Court of Appeals,
Federal Circuit.

Oct. 17, 1985.

Harold James, James & Franklin, New York City, argued for appellant. With him on brief were Myron Amer and Richard N. Friedman.

Steven B. Pokotilow, Blum, Kaplan, Friedman, Silberman & Beran, New York City, argued for appellee. With him on brief were Harold I. Kaplan, L. MeRoy Lillehaugen and Peter D. Aufrichtig.

Before MARKEY, Chief Judge, and FRIEDMAN and RICH, Circuit Judges.

MARKEY, Chief Judge.

In appeal No. 84–866, Pegasus Luggage, Inc. (Pegasus) appeals from the portion of the judgment of the United States District Court for the Southern District of Florida, Miami Division, holding it liable for infringement of claims 3–5 of United States Patent No. 3,730,308 (the '308 patent), of Lark Luggage Corporation (Lark), a division of CPG Products Corporation (CPG), and further enjoining Pegasus from acts of unfair competition under the Lanham Act § 43(a), 15 U.S.C. § 1125(a) (1983). *See* 221 USPQ 766 (S.D.Fla.1983).

In appeal No. 84–880, Pegasus appeals from a denial of its Rule 60(b), Fed.R. Civ.P., motion for relief from final judgment.

In appeal No. 84–972, CPG cross-appeals from the portion of the judgment denying its claims for (a) increased patent infringement damages under 35 U.S.C. § 284, and (b) attorney fees under 35 U.S.C. § 285.

The foregoing appeals were consolidated in response to an April 18, 1984 motion of CPG.

We affirm in Appeal Nos. 84–866 and 84–880, and reverse and remand in Appeal No. 84–972.

ISSUE

Whether the district court erred in entering the decision and judgments appealed from.

OPINION

*A. Appeal Nos. 84–866 and 84–880*

The findings and conclusions entered by the district court respecting patent infringement form such a fully adequate and compelling basis for affirmance as to place on the borders of frivolity the appeals from the patent infringement portion of the judgment and the decision denying Pegasus' Rule 60(b) motion.

Respecting patent infringement, Pegasus asserts that: (a) the named inventor (Pelavin) was not the true inventor; (b) the patent does not disclose the "best mode"; (c) claims 2 & 3 are anticipated by United States Patent No. 3,071,220 to O'Neil (O'Neil patent), and the other claims "are obvious thereover" [sic, "in view of the O'Neil patent"]; (d) its luggage does not infringe the claims in suit; and (e) the royalty rate is unsupported.

Respecting unfair competition under § 43(a), Pegasus argues (f) that Lark's case was not proven.

*(a) Inventorship*

Pegasus raised this issue for the first time in its Rule 60(b) motion for relief from judgment, asserting that Pelavin received the suggestion to use Pellon in luggage from the Pellon Company, and that the district court confused "entrepreneurship with inventorship," citing *Morgan v. Hirsch*, 728 F.2d 1449, 221 USPQ 193 (Fed. Cir.1984).

In its Rule 60(b) motion, Pegasus alleged "surprise", "newly discovered evidence" and "misrepresentation or other misconduct of an adverse party." It offered, however, nothing in support of those allegations save the naked assertions of counsel. Before us, Pegasus points to nothing in the record to indicate that the district court in any manner abused its discretion in denying the motion. *See Smith International,*

*Inc. v. Hughes Tool Co.*, 759 F.2d 1572, 1579, 225 USPQ 889, 895–94 (Fed.Cir.1985). Pegasus' present attempt to litigate an issue it failed to raise at trial is improper and unavailing.

### (b) Best Mode

■ Similarly, Pegasus first raised this issue in its post-trial motions for new trial under Rule 59, Fed.R.Civ.P., the denials of which are not before us. In support of its notion that this court should hear and determine whether Pelavin disclosed the "best mode", Pegasus asserts that the district court determined that issue on its merits in denying the Rule 59 motions. The assertion is groundless. The district court carefully considered Pegasus' motion, CPG's response, and counsel's memoranda, in determining that a new trial was not required. That action does not constitute consideration and determination of the "best mode" issue on its merits sufficient to render it available to Pegasus on appeal. If the rule were otherwise, appellants could create "appealable" substantive issues by merely listing them in post-judgment motions for new trial.

Pegasus improperly asserts before us the very allegations—none made at trial—which formed the basis of its Rule 59 motions. In sum, there was and is no basis for Pegasus' presentation of its "best mode" proposition to this court. *Cf. Minnesota Mining & Mfg. Co. v. Eco Chemical, Inc.*, 757 F.2d 1256, 1265–66, 225 USPQ 350, 357 (Fed.Cir.1985).

### (c) Anticipation/Obviousness

■ The district court found that the O'Neil patent "does not contain any disclosure of the use of Pellon or Pellon-like materials as an interlining or stiffening layer in the walls of a luggage construction." Pegasus points to no error in that finding. Nor has it shown error in the district court's view that the O'Neil patent "reinforces the conclusion of patentability reached by the Examiner". Utterly unconvincing is Pegasus' argument that the "resilient tips" disclosed in the O'Neil patent either anticipate or would have rendered obvious the construction set forth in any of the claims in suit.

### (d) Infringement

■ Pegasus says its use of adhesive precludes a finding of literal infringement. It argues that because the '308 patent issued following Pelavin's assertion that he did not use adhesive to secure the multi-layer construction of the luggage wall, infringement is avoided if any adhesive be used for any purpose. Pegasus invokes the recognized rule of law that a prosecution history estoppel precludes a patentee's claiming in litigation what it voluntarily gave up in prosecution. That rule is not applicable to the present facts, where no such prosecution history estoppel exists.

The district court found that Pegasus also does not use adhesive to secure its multi-layer construction; it uses adhesive only in its manufacturing process (to align the layers until it secures them, as Lark does, by mechanical stitching). The district court said that such use was "of such minor consequence and inconsequential effect," as not to preclude its finding that literal infringement had been properly shown. Pegasus has shown no error in that finding; nor has it even attempted to controvert the district court's alternative finding of infringement under the doctrine of equivalents.

### (e) Reasonable Royalty

■ Pegasus says that the district court's ruling on a royalty rate was "premature" because Pegasus "was not prepared to, and made no attempt to, deal with the issue of damages" at trial. But CPG did "deal with the issue" at trial, presenting evidence that it would not voluntarily grant a license for less than a 20% royalty. CPG's evidence cannot be "undealt" by Pegasus' omission, however bitterly that omission may now be rued. It is not among the purposes of the appellate process to re-write the scenario produced by an appellant at trial. Nor is it among the

roles of this court to entertain such efforts at re-writing.

Pegasus incorrectly says that "the facts of record are inadequate to support the determination of any royalty rate." It is not, however, the royalty rate but Pegasus' protestation that is unsupported by the record. Similarly, Pegasus has shown no basis for concluding that the district court abused its discretion in awarding pre-judgment interest.

### (f) Unfair Competition

### (i) Section 43(a)

Pegasus suggests that the district court should have entered findings and conclusions different from those it did enter in respect of the count for unfair competition under § 43(a).[1] Whether we might, were we sitting at trial, have reached different findings and conclusions is not, however, the test.[2] *See The American Original Corp. v. Jenkins*, 774 F.2d 459, 462 (Fed. Cir.1985), citing *Anderson v. City of Bessemer City*, —— U.S. ——, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

In deciding pendent § 43(a) matters, over which this court's jurisdictional statute, 28 U.S.C. § 1295(a)(1), does not grant exclusive subject matter jurisdiction, we apply the discernable, established law of the regional circuit court of appeals (here the Eleventh), having a proper regard for the duty of the district court to follow that law in cases not appealable to this court. *See Bandag, Inc. v. Al Bolser's Tire Stores,* 750 F.2d 903, 909, 223 USPQ 982, 986 (Fed. Cir.1984); *Atari, Inc. v. JS & A Group, Inc.,* 747 F.2d 1422, 1439–40, 223 USPQ 1074, 1086–87 (Fed.Cir.1984).

Under the substantive law of the Eleventh Circuit, analysis of trade dress infringement under § 43(a) of the Lanham Act involves a close, factual evaluation of "the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980, 219 USPQ 515, 528 (11th Cir.1983), citing *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 831, 215 USPQ 745 (11th Cir.1982). As is evident from the total record, the district court considered the total image of the Lark luggage in light of the legal principles ennunciated in *Harland* and *Original Appalachian Artworks*.

The Eleventh Circuit in *Harland* did not require that a plaintiff establish non-functionality of all features in common relied on; it required plaintiff to establish that the features of the trade dress are "primarily non-functional". (Emphasis added.) 711 F.2d at 982, 219 USPQ at 529. As stated in *Harland*, "[i]f … all of the features of Harland's Memory Stub product are functional, then Clarke was free to copy those features in the absence of any trademark or copyright protection." *Id.* However, "[i]f … Clarke copied features of Harland's trade dress which are primarily non-functional, then Clarke is liable for

---

1. Both parties submitted proposed findings and conclusions. Those proposed findings and conclusions were not made of record here, and the brief of neither party suggests that the court blindly adopted any. A review of the trial court record by this court *sua sponte* reveals that of the eight findings proposed by CPG, the district court adopted one as proposed, modified three before entering them, and refused to enter four. The district court refused to enter the findings proposed by Lark on willful infringement, *infra.*

2. *See Boston Prof. Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.,* 510 F.2d 1004, 1013, 185 USPQ 364, 370 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975) ("Our review is narrowly circumscribed by F.R.Civ.P. 52(a). We find that there is substantial evidence which reflects that defendant competed unfairly with plaintiffs and, accordingly, we affirm the decision of the district court in this regard."). That holding is binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard, Ala.,* 661 F.2d 1206, 1207 (11th Cir.1981) (in banc); *University of Georgia Athletic Ass'n v. Laite,* 756 F.2d 1535, 1543, 225 USPQ 1122, 1128 (11th Cir.1985); *see also Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.,* 716 F.2d 833, 839–40 & n. 16, 222 USPQ 10, 16 & n. 16 (11th Cir.1983) (likelihood of confusion is a question of fact and clearly erroneous standard "presents a formidable challenge to appellants who … seek to overturn the factual findings [re § 43(a)] of a district court").

infringement under § 43(a)." *Id.* There, as here, trade dress consisted of utilitarian features and ornamental features found by the district court to have been "distinctive and memorable". Finding J.3.

The court in *Harland* noted that "many features of Harland's Memory Stub product—such as the concept and location of the carry-around stub, the lines for recording information on the stub, the vertical size of the stub, and perhaps the horizontal size of the stub as well—clearly are functional." *Id.* at 983–84, 219 USPQ at 530–31. The court held, nonetheless, that the district court's determination that other features were "primarily non-functional" could not be overturned on review, and that that determination supported a finding of unfair competition under § 43(a). *Id.* at 987, 219 USPQ at 531.

Pegasus argues that the district court failed to find "secondary meaning" with respect to PERMAMATIC's non-functional features. The Eleventh Circuit had not, at the time of the district court's decision, addressed whether secondary meaning must always be shown, *see Harland, supra,* 711 F.2d at 981 n. 25, 219 USPQ at 529 n. 25., but found "merit" in the view "that plaintiff in a trade dress infringement action need not prove secondary meaning when the product's trade dress is inherently distinctive." *See Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.,* 659 F.2d 695, 212 USPQ 904 (5th Cir.1981), *cert. denied,* 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982). In the recent case of *University of Georgia Athletic Ass'n v. Laite,* 756 F.2d 1535, 1540, 225 USPQ 1122, 1126 (11th Cir.1985), the Eleventh Circuit limited the need to establish secondary meaning to § 43(a) actions involving descriptive marks.

■ Here, the district court found that the ornamental embellishments of Lark's PERMAMATIC are "distinctive and memorable". Finding J.3., *infra.* Evidence of deliberate imitation and copying in this case also supports a determination of secondary meaning. *See Harlequin Enterprises Ltd. v. Gulf & Western Corp.,* 644 F.2d 946, 950, 210 USPQ 1, 3 (2d Cir.1981). Moreover, as noted in *Chevron Chemical,* the principal question in a § 43(a) analysis "is whether or not the public is likely to be confused, rather than whether the first comer's trade dress has acquired secondary meaning." 659 F.2d at 703, 212 USPQ at 911.

As stated in *Original Appalachian,* "[t]he essential element of an action under § 43(a) is proof by the plaintiff that the alleged infringement by the defendant creates a likelihood of confusion on the part of consumers as to the source of the goods." 684 F.2d at 831, 215 USPQ at 753. A finding of likelihood of confusion "rests on an evaluation of a variety of factors including the defendant's intent, the similarity of design, the similarity of product, the similarity of retail outlets and purchasers, the similarity of advertising media, and actual confusion. *Chevron Chemical, supra,* 659 F.2d at 703." *Id.* at 832, 215 USPQ at 754. The *Original Appalachian* court affirmed that that finding "is factual and must be upheld unless clearly erroneous. *Dallas Cap & Emblem, supra,* 510 F.2d at 1012." *Id.,* at 832, 215 USPQ at 754.

The district court here found that, with the exception of Lark's stripe, "each and, every distinctive design feature of the PERMAMATIC luggage has been adopted in the PEGASUS 1700 Series," citing "color", "trim" and "shape of trim" as three such features. Finding J.1. The list is not exhaustive, nor need it be. As above indicated, the Eleventh Circuit looks to "the total image" of the luggage, not to a catalogue of separated particulars.

In its Finding J.3, the district court found:

The ornamental embellishments of LARK'S PERMAMATIC are "distinctive and memorable", are not functional and have clearly been adopted by PEGASUS with an intent to cause a likelihood of confusion to the purchasing public.

In the present case, the district court observed physical comparisons by both parties of the actual Pegasus (Exhibit 12) and

Lark (Exhibit 5) luggage (a demonstration not conducted before this court). It heard testimony subject to cross examination and had the opportunity to observe the demeanor of the witnesses. In affirming the district court in a similar case, the Eleventh Circuit stated, "Intent [to confuse customers], as the district court noted, must often be proved by circumstantial evidence". *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 843, 222 USPQ 10, 19 (1983).

■ Patent infringement is not the unfair competition envisaged in § 43(a), and utilitarian features attributable to a patented structure cannot in themselves and alone create trademark distinctiveness. The district court did not in this particular case gainsay those fundamental legal principles when it noted that the presence of such features "when coupled with non-functional features," Finding J.2, intentionally created a distinct total image intended to confuse the public, i.e., to create a false designation of origin as to the source of Pegasus' luggage. *Cf.* Finding J.4.

■ The district court concluded, following a physical comparison of the respective luggage lines, that Pegasus had copied "not only the utilitarian features" (which Pegasus was perfectly free to do absent Lark's patent protection, *see Harland*, 711 F.2d at 982, 219 USPQ at 529), "but also the non-functional features of the PERMA-MATIC construction." Conclusion E.1. The district court then went on, saying "[s]uch copying is likely to confuse the public about the origin of the PEGASUS luggage construction by adopting *all of the design embellishments* of LARK's PERMAMATIC luggage." (Emphasis added) Conclusion E.1.

The language of Conclusion E.1 ("such copying") may have been inartful. Read in full context, however, it is clear that the district court considered Lark's design embellishments to be primarily non-functional, and viewed Pegasus' copying of *those* features as "likely to confuse the public". Findings and conclusions must be viewed as a whole, and it is not necessary to read

Conclusion E.1 as being in conflict with Finding J.3, *supra*, i.e., as though it was based on the view that copying of utilitarian or functional features alone is sufficient to support a finding that likelihood of confusion was present and intended. Nor, assuming *arguendo* that the district court did not consider all relevant factors, would that circumstance constitute an independent basis for reversing its decision. *University of Georgia Athletic Ass'n, supra,* 756 F.2d at 1542–43, 225 USPQ at 1128.

As noted in *Harland*, trade dress is "a complex composite of features" which must "be considered together, not separately." 711 F.2d at 980, 219 USPQ at 528. The district court here followed that guidance in finding that Pegasus used features such as color, trim, and shape of trim to create a "medium for confusion". Finding J.4. If the district court included a reference to "Lark's unique functional concept", Finding J.4, because it saw a presence of that concept in the total image of the luggage, such inclusion was not in this case a substitution of patent law for that of unfair competition.

■ In this case, the district court found Lark's ornamental embellishments "memorable and distinctive", and that those features had been "clearly adopted by Pegasus with an intent to cause a likelihood of confusion of the purchasing public." That finding has not been shown to have been clearly erroneous.

### (ii) The Injunction

■ On the present record, and under the appropriate appellate standards, there is no basis for holding either that the district court's judgment on the unfair competition count was the result of reversible error, or that the district court abused its discretion in granting injunctive relief against continuance of that unfair competition. The district court's injunction did not preclude fair competition and did not undermine the laws governing the right generally to compete and to copy the products of others (absent patent infringement or

false indication of origin). On the contrary, it tailored its injunction, prohibiting Pegasus only from selling "the 1700 series of luggage or any luggage which looks similar thereto". Thus Pegasus remains in the luggage business and can use any color, trim, shape of trim, or other design embellishment it chooses, except such combination and design of those elements as may result in luggage that looks similar to the 1700 series it employed as its means of confusing the public.[3]

In arguing that it must remain free to use black and tan colors used by others, and that the shape of its present trim is slightly different from Lark's, Pegasus argues a different case and attacks an injunction never issued. Pegasus' designers are not precluded from using black as a color, or tan leather trim, or a wide variety of shapes of trim, in creating luggage that will not lead to the likelihood of confusion that resulted from the 1700 series. Indeed, compliance with the injunction against patent infringement may itself remove part of the designer's problem, to the extent that the patented construction contributed to the total image of the 1700 series luggage.

 Pegasus thus remains fully free to compete, so long as purchasers are not likely to be deceived as to the origin of its goods. The district court found, and no error has been shown in that finding, that with the "total image" of its 1700 series Pegasus intended to and did create a likelihood of confusion of purchasers. The injunction against unfair competition merely requires that Pegasus cease that course of conduct. Properly interpreted, that injunction was on the total record in this case eminently fair and proper.[4]

Pegasus urges us to look, inappropriately, at individual features separately and to review the judgment and the injunction against unfair competition in a vacuum, i.e., as though there had never been a trial in which the district court heard witnesses, evaluated credibility, and compared in their entireties the respective lines of luggage before making its findings, reaching its conclusions, and issuing its injunction. We have no such authority.

### B. Appeal No. 84–972

#### (a) Willful Patent Infringement

As found by the district court, Pelavin in the spring of 1980 spoke with Seymour Friedman (Friedman), President of Pegasus, at the Dealers' Luggage Show in New York City, New York, and told Friedman he was infringing the '308 patent. Friedman said he was unaware of even where to obtain a copy of a United States patent. Friedman also said he would not have continued infringing if the patent was owned only by the old Lark Luggage Corporation, but, now that Lark was a subsidiary of General Mills (i.e., CPG) it did not bother him to continue. After receiving a copy of the '308 patent from Pelavin, Friedman, though not a lawyer and admittedly having little knowledge of patent law, decided that the patent was not valid or not infringed and, without advice of counsel, continued

---

3. We review not what the district court said at trial, but what it did, i.e., the injunction as ordered. It reads:

> 9. By reason of its acts of unfair competition, Pegasus Luggage, Inc., its officers, employees, agents, successors, assigns, servants, and all persons in active concert and participation with them or controlled by them shall be and are hereby permanently enjoined and restrained from selling and offering for sale the 1700 Series of luggage or any luggage which looks similar thereto.

4. As airline passengers are continually warned, all luggage may in a broad sense look "similar". We interpret the injunction as precluding sale of luggage that looks *so* similar to the 1700 series as to effectively continue the likelihood of confusing purchasers found by the district court to have resulted from the 1700 series. Pegasus did not request the district court to clarify the injunction, nor has it on appeal asserted difficulty in understanding its breadth. The district court remains available to the parties if such difficulty should in future arise.

Though the district court ordered accountings for damages resulting from patent infringement and from unfair competition, Lark is not entitled to dual damages resulting from the same act. *See Stewart & Stevenson Services, Inc. v. Pickard,* 749 F.2d 635, 644 (11th Cir.1984).

manufacturing Pegasus' 1700 series of luggage.[5]

The district court said that "[a]lthough Defendant made and sold, and continued to make and sell, the accused luggage construction his action is not construed as clearly deliberate.... The record is clear that Defendant made no inquiry into the validity of LARK's claim of infringement and simply ignored same. Having made no effort to ascertain the scope of the patent, or its validity. [sic] However, this court finds that his disregard does not reach the level of deliberate indifference or wanton infringement." The district court thereupon denied CPG's claims for treble damages and attorney fees.

It appears likely that the district court had neither seen nor had called to its attention *Underwater Devices, Inc. v. Morrison-Knudsen Co., Inc.,* 717 F.2d 1380, 1389–90, 219 USPQ 569, 576 (Fed.Cir.), decided September 23, 1983. In that case, this court said:

> Where, as here, a potential infringer has actual notice of another's patent rights, he has an affirmative duty to exercise due care to determine whether or not he is infringing. [Citations omitted.] Such an affirmative duty includes, *inter alia,* the duty to seek and obtain competent legal advice from counsel *before* the initiation of any possible infringing activity. [Citations omitted.]

A district court's finding in respect of willful infringement is a finding of fact, reviewable under the clearly erroneous standard of Rule 52(a), Fed.R.Civ.P. *Underwater Devices, supra,* 717 F.2d at 1389, 219 USPQ at 576.[6]

■ The district court's ultimate finding of no deliberate or willful infringement is incompatible with the applicable findings it clearly articulated. Pegasus has shown

no error in the findings that: (1) Friedman was informed of Pelavin's specific allegation of infringement and was given a copy of the '308 patent; (2) Friedman took no affirmative steps—through consultation with counsel or otherwise—to ascertain whether Pegasus' 1700 luggage series infringed the '308 patent; and (3) Pegasus deliberately continued infringing because Lark was a subsidiary of General Mills. Each of those findings is not merely supported but is compelled by the record. The district court's finding that Pegasus' behavior on this record failed to constitute willful and deliberate infringement is on those facts anomalous and thus clearly erroneous.

We therefore remand the issue of increased damages under 35 U.S.C. § 284 to the district court for reconsideration in light of our present holding on this appeal that Pegasus' infringement was willful. *See generally The American Original Corp. v. Jenkins,* 774 F.2d 459, 464–466 (Fed.Cir.1985); *King Instrument Corp. v. Otari,* 767 F.2d 853, 226 USPQ 402 (Fed. Cir.1985); *Rosemount, Inc. v. Beckman Industries, Inc.,* 727 F.2d 1540, 221 USPQ 1 (Fed.Cir.1984); *Underwater Devices, supra,* 717 F.2d 1380, 219 USPQ 569.

### (b) Attorney Fees

The district court made no determination of whether the case *sub judice* is an "exceptional case" warranting an award of attorney fees under 35 U.S.C. § 285. We therefore include that question in our remand.

### Conclusion

The portion of the judgment and the injunction appealed from in appeal No. 84–866 is *affirmed.*

---

5. The district court found that Friedman's testimony with respect to efforts to merchandise the 1700 series luggage case severely impeached his credibility.

6. When increased damages are awarded under § 284, the *measure* of those damages is commit-

ted to the discretion of the district court, the exercise of which will not be overturned absent a clear showing of abuse. *Rosemount, Inc. v. Beckman Instruments, Inc.,* 727 F.2d 1540, 1547–48, 221 USPQ 1, 8 (Fed.Cir.1984).

The denial of the Rule 60(b) motion appealed from in appeal No. 84–880 is *affirmed.*

The judgment appealed from in appeal No. 84–972 is *reversed* and the issues of increased damages and attorney fees are *remanded.*

AFFIRMED–IN–PART, REVERSED AND REMANDED–IN–PART.

RICH, Circuit Judge, dissenting in part.

I agree with the result reached on the patent issues but not with all that is said in doing so.

All I dissent from is the majority's treatment of the § 43(a)[1] aspect of this case, the "(f) *Unfair Competition*" section of its opinion.

The majority opinion, with an undue reliance on Rule 52(a) and failure to heed the evidence, creates a more persuasive case for plaintiff than even the plaintiff-drafted findings of fact by further highlighting selected highlights thereof. But those findings[2] are fatally flawed as (1) in large part unsupported by, or even contrary to, the evidence in the case; (2) based on unsound legal principles; (3) contrary to the law of the Eleventh Circuit and the law of other circuits as adopted by the Eleventh Circuit and this circuit; (4) not a product of independent judicial thinking; and (5) to some extent self-contradictory.

### I.

Three aspects of the law of this country are involved. The complaint contained two distinct and separate counts, one for patent infringement and one for "false designation of origin and false descriptions or representations arising under the Trademark Laws of the United States, 15 U.S.C. § 1125(a)," which is § 43(a) of the Lanham Act (note 1, supra), the designation I shall use. Therefore, we are involved, firstly, with the patent laws which provide for *time-limited* rights to exclude others from making, using or selling inventions covered by patent claims. The patent here involved expires in less than 5 years. Secondly, we are involved with § 43(a) which deals basically with *unfair* competition, more particularly with competition which is unfair because it involves *false* designation of origin, *false* description, or *false* representation, terms which have been given broad interpretations where commercial unfairness is found. Protection against such unfair competition is not time-limited like patent rights. It is closely akin to the protection given trademarks and the courts apply the same principles. *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 981, 219 USPQ 515, 528 (11th Cir.1983). Traders must not deceive or confuse purchasers about the *origins* of merchandise. The third aspect of the law, which is involved with and tempers both of the foregoing, is the underlying principle involved in antitrust law: competition in the marketplace is to be encouraged and to that end copying—even outright, deliberate copying—is permitted as beneficial to consumers except where it is forbidden by patent law or deemed "unfair" because it involves explicit or inherent falsification of some kind. *See Sears Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661, 140 USPQ 524 (1964), and *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669, 140 USPQ 528 (1964).

It seems to me that the majority, like the district court, have completely forgotten or

---

**1.** The Lanham Trademark Act of 1946 § 43(a), 15 USC 1125(a), the relevant provision of which reads as follows:

Any person who shall ... use in connection with any goods ... a *false designation of origin,* or any *false description or representation,* including words or other symbols tending *falsely to describe or represent* the same, and shall cause such goods or services to enter into commerce, ... shall be liable to a civil action by any person ... who believes that he is or is likely to be damaged by the use of any such *false* description or representation. [Emphasis mine.]

**2.** On the § 43(a) issue there are only four fact findings, designated "J. 1–4" which are to be found in 221 USPQ at 776. The three corresponding conclusions of law are "E. 1–3," 221 USPQ at 780–81.

overlooked the third aspect and have treated all copying done by defendant Pegasus—assuming there was copying—as though it were inherently wrong. They have also approved mixing up by the district court (though it is denied) of the distinct matters of legitimate patent right enforcement with unfair competition as though patent infringement by itself were a § 43(a) offense, which it is not, as the majority admit. Patent infringement is not false representation. The two counts of the complaint represented separate causes of action (over one of which we have exclusive appellate jurisdiction and over the other of which we do not). Each must be *separately* proved. In my opinion, after reading the entire trial transcript, appellee CPG did not prove its § 43(a) action, Count II, and it should have been dismissed.

## II.

The applicable law on § 43(a) cases in the Eleventh Circuit is well, recently, and succinctly stated in *John H. Harland Co. v. Clarke Checks, Inc.*, supra, 711 F.2d at 980, 219 USPQ at 528, as follows:

This court and the former Fifth Circuit have held that § 43(a) creates a federal cause of action for trade dress infringement. [Cases cited.]

"Trade dress" involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques. *See, e.g., Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d at 831 ("adoption procedures used by [plaintiff] in the sale of its dolls qualify as protectable trade dress"); *SK & F Co. v. Premo Pharmaceutical Laboratories, Inc.*, 481 F.Supp. 1184, 1187 [D.C.N.J.] (stating that "[t]rade dress is a complex composite of features" including, *inter alia,* size, color, texture, and graphics, which must "be considered together, not separately"), *aff'd,* 625 F.2d 1055 (3d Cir.1980); 1 J.T. McCarthy, *supra,* § 8.1, at 230–31.

Most trade dress infringement actions involve the packaging or labeling of goods. [Cases cited.] Recently, however, courts have recognized that the design of a product itself may constitute protectable trade dress under § 43(a) of the Lanham Act. *See, e.g., Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76 (2d Cir.1981) (distinctive color and symbols on toy car protected under § 43(a)); *Harlequin Enterprises Ltd. v. Gulf & Western Corp.*, 644 F.2d 946 (2d Cir. 1981) (distinctive book covers protected against trade dress infringement); *Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d 1210 (8th Cir.) (unique exterior design of twin hopper bottomed grain semi-trailer protected under § 43(a)), *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976).

In order to prevail on a claim for trade dress infringement under § 43(a), plaintiff must prove three basic things: "[T]hat the trade dress of the two products is confusingly similar, that the features of the trade dress are primarily non-functional, and that the trade dress has acquired secondary meaning." *Black & Decker Co. v. Everready Appliance Manufacturing Co.*, 518 F.Supp. 607, 616 (E.D.Mo.1981), *aff'd,* 684 F.2d 546 (8th Cir.1982); *accord, Vuitton Et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 772–73 (9th Cir.1981); *SK & F Co. v. Premo Pharmaceutical Laboratories, Inc.*, 625 F.2d 1055, 1065 (3d Cir.1980); *Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d at 1217–21.

With respect to this statement of the law, I point out that it is not peculiar to the Eleventh Circuit, which, as is apparent, has gleaned its authorities from several other circuits and that the law in this circuit is no different. It is pretty much the same everywhere. Next, I would like to emphasize something that the trial court apparently failed to understand; similarities between two products with respect to such things as size, shape, color, texture, and sales techniques is not necessarily enough per se to make out a case of "trade dress" infringement under § 43(a). One or more of these things may be common to the trade. Under that statute there must be

something in the nature of unfairness or falsification, or evidence of an intent to mislead or cause confusion as to origin. I find *no evidence of intent* in this case and when challenged with its absence, appellee has had nothing to say. The trial court merely inferred intent. The finding of intent is clearly erroneous.

Finally, I return to and emphasize the last paragraph quoted above which states the three basic things a plaintiff such as CPG must establish to prove a claim under § 43(a): *confusing* similarity, *non-functionality* of the features in common relied on, and the existence of *secondary meaning* in the purloined features or combination of features relied on in the plaintiff's product, which means that those features by themselves have trademark (origin indicating) significance in the minds of the public. *No evidence was produced by CPG to show either secondary meaning or likelihood of confusion*, two necessary elements of its case.

CPG's brief in this court on the § 43(a) issue consists of only 4 pages devoted solely to the single contention that it is not necessary to show secondary meaning, which clearly indicates CPG's awareness of the absence of any evidence on that matter. Assuming, arguendo, that *that* contention is correct, there is still no evidence of likelihood of confusion. The evidence shows only certain common features, and that brings me to the question of the effect of those common features on the viewer and the equally important questions of Pegasus' right to copy them, or use them regardless of copying, and whether it did in fact copy them.

### III.

In order to comprehend a discussion of the copying question, one must have a visual impression of what the luggage in this case looks like, to which end I annex to this opinion copies of plaintiff's exhibits 16 and 31. Ex. 16 shows the LARK PERMAMATIC luggage made by the Lark Division of CPG (now owned by General Mills, Inc.). Ex. 31 shows the Pegasus case. Suitcases of this type are known in the trade as "packing cases."

Pegasus is no fly-by-night "knock off" artist; it is as substantial as Lark and the two companies are apparently steady competitors. Pegasus is not interested in having purchasers think its luggage is Lark's. Its annual gross approaches $8 million and Seymor Friedman, its president, was elected president of The Luggage and Leather Goods Manufacturers Association. Pegasus employs 250 people in its factory in Florida. It has advertised on prime time TV. Lark makes the more expensive line of cases. If it comes out with a successful line, there is no reason in the law of this country why Pegasus should not try for its share of the market, subject to the limitations I have mentioned above—so long as it avoids patent infringement (which it has not done here) and so long as it does not conduct its business so as to *mislead* the purchasing public by some *falsification* as to whose merchandise it is buying. These are two utterly different matters and my point is that, even though Pegasus may have done some copying, the evidence in this case does not show it has done more than it is entitled to do within the principles of § 43(a) and the case law developed thereunder. Granted that Pegasus is liable for patent infringement, all I am discussing is whether it is *separately* liable for *unfair* competition within the meaning of § 43(a). Patent infringement is not unfair competition in that sense. I will dispose of that point first.

The ordinary purchaser cannot tell by looking at either packing case whether or not it contains the Pelavin patented invention. The invention is invisibly contained in the structure of the case. It has no more effect on appearance than the rustproofing on the bottom of a new car has on the appearance of the car. Callman, the trademark authority, in his "Unfair Competition and Monopolies," § 4.57, page 81, says:

> Where a plaintiff-competitor pleads both patent infringement and unfair competition, the courts have properly held, when the acts are identical, that the

cause of action for unfair competition must be dismissed. [Citing 6 cases.] In other words, patent infringement is not, in itself, also unfair competition. The trial court, now with majority approval, treated it as though it were. That is an undesirable innovation in the law.

Now I call attention to the illustrations in the annexed exhibits. Names are the most obvious indications of origin and Ex. 16 shows a hang-tag or key-chain tag bearing the name LARK hanging from the handle. The evidence is that Pegasus also used fabric hang-tags with its flying-horse logo and name on them, and stamps PEGASUS with a hot die on the front of the case. Its origin-indicators also appear inside the case, which a purchaser would surely examine before buying this expensive item. There is no false representation here.

The other possible distinguishing feature of LARK luggage is what the witnesses referred to as the "Gucci stripe" common to the Lark line—a wide band of material with three stripes having the colors of the Italian flag, disposed vertically on the top or front face of the case in line with the handle. Both parties and the trial court have treated the stripe as a trademark, which means that it indicates LARK as the origin. *No such stripe or any similar feature is used on Pegasus' cases,* and the trial court so held (finding J–1).

Aside from the names, which differ, and the stripe, used by LARK but not by Pegasus, what else is there on which to base a claim of *false* indication or origin or *unfair* immitation. As Gertrude Stein would have said, "A suitcase is a suitcase is a suitcase." What color would you have? Black nylon with tan leather or vinyl trim? Anyone in the luggage business is free to select and sell such a combination. Several do. Mr. Pelavin, inventor of the patent-in-suit, a former owner of LARK, instigator of the suit, and principal fact witness for CPG, conceded that *many firms were using the same colors,* saying "you can't obtain protection from using a color." Indeed, it is foolish even to think of color as an indication of origin in this case, in com-

bination with other features or by itself, when both parties offer their luggage in a variety of colors. But the trial court did. There is no justification for the reference in Finding of Fact J–4 to "LARK's color." Which color? Lark has no proprietary color, the evidence from Lark's founder being that other manufacturers use the same various colors.

The trial judge, in finding J–1, refers to "trim and shape of trim." The only trim I can see that has *shape,* other than straight lines applied around obvious margins where trim is normally used on luggage, are the four corner reinforcements, and the corner reinforcements are definitely of *different* shapes. The shape in Pegasus is clear from the picture. LARK's, which is not so clear, differs in having a convex curve in the middle whereas Pegasus has a concave curve; just the opposite. How could this confuse purchasers as to origin?

All that is left is the handles. As may be seen, they differ markedly. LARK has rectangular lines, Pegasus curved. Luggage, specifically packing cases, like cars, has a way of looking very much alike regardless of who makes it. Each type is bound to have many features in common. But does anyone really have much trouble telling a Buick from a Cadillac? LARK fancies itself the Cadillac of the field here involved. Is Pegasus, as the Buick in the business, to be prevented from making a bag with many similar appearance features? If so, why? Isn't that the way competitive merchandising is customarily done? Isn't that what the public wants and has a right to?

In my judgment, the findings of fact, essentially written by Lark's counsel for and adopted by the trial judge on the Count II § 43(a) Unfair Competition issue are totally unjustified by the record in this case and *are* clearly erroneous. So are the conclusions of law on that issue, also essentially drafted by Lark's counsel, being based as they are on clearly erroneous fact findings and unsound legal principles.

### IV.

The aspect of this case that perhaps concerns me most is that the trial judge used the patent infringement as a primary aspect of its § 43(a) unfair competition case, notwithstanding the majority's effort at denying it. This is clear from the emphasized portions of Findings of Fact J–2 and J–4 (all emphasis mine):

> 2. *By reason of LARK's patent rights the utilitarian feature of crushable, deformable, light weight luggage is unique* to the LARK PERMAMATIC construction. Thus, *when coupled with* the non-functional features of the PERMAMATIC construction, PEGASUS intended to and, in fact, is likely *to confuse the public about the origin* of PEGASUS' luggage *construction* by adopting all of the design embellishments of LARK's PERMAMATIC luggage. (Pelavin Tr., 109).

> 4. PEGASUS['] use of LARK's color and trim *in combination with its copying of LARK's unique functional concept* creates a medium for confusion and may cause a consumer to be subjected to *others* claiming that they can obtain the PERMAMATIC luggage *by another name* through *other outlets* at a cheaper price.

Finding 2 is a *verbatim* copy of LARK's proposal omitting only three "R-in-a-circle" symbols appended to PERMAMATIC. Finding 4 was in substance proposed by LARK. The changes made were: (1) "color and trim" for "ornamental emblishment [sic]"; (2) "may cause a consumer" for "will cause the public"; and (3) omission of one symbol as in finding 2. The second half of finding 4, upon analysis, is truly gibberish. I know from the record and arguments therein that the "others claiming" refers to retail salesmen having no connection with Pegasus; but how they would persuade a customer that a packing case sold under the name PEGASUS is really a LARK PERMAMATIC case escapes me. So does the meaning of "other outlets." That Pegasus cases sell for less than LARK cases is not in dispute and is a fact in which purchasers are much interested. Perhaps it is trying to say one can enjoy all the advantages of a LARK PERMAMATIC case for less money by buying a PEGASUS case, but I have never heard that this is either false or misleading *as to the origin* of the merchandise or within the purview of § 43(a).

Conclusion of Law "E. Unfair Competition," paragraph 1, in pertinent part, reads:

> 1. The PEGASUS 1700 Series has copied not only the *utilitarian features described and claimed in the suit patent,* but also the non-functional features of the PERMAMATIC construction. *Such copying* is likely to confuse the public about the origin of the PEGASUS luggage *construction* by adopting all of the design embellishments of LARK'S PERMAMATIC luggage. The essential element of an action under § 43(a) is proof by the plaintiff that the alleged infringement [patent or trademark?] by the defendant creates a likelihood of confusion on the part of consumers as to the source of the goods. [Emphasis and bracketed insertion mine.]

This conclusion is LARK's proposal with only the following insubstantial changes: (1) a comma in line 1; (2) "is likely" for "was intended" in line 5; (3) omission of two "R-in-a-circle" symbols. I have omitted at the end a citation to the *Original Appalachian Artworks* case.

I am unwilling to lend my name to the approval of such a jumble of patent and unfair competition law, and I am surprised to find the majority doing so. That was, however, the theory on which the plaintiff, CPG, proceeded and argued to the trial judge. In response to Pegasus' motion for a "directed verdict" (this is not a jury case) on Count II, § 43(a) Unfair Competition, at the close of the plaintiff's case, the argument ran as follows:

> [T]his piece of [Pegasus] luggage here is basically a copy of the heart and soul of the Pelavin invention.... So what we have is we have a copy of the utilitarian features that lead to the Count I of the complaint, namely, patent infringement.

There's been wholesale copying of every substantive feature in the Permamatic case in this case. But did Pegasus stop at that? Your Honor, what they have done in addition to that, and I believe that the factual witnesses pointed that out is the color. The color per se is not unique to Lark. The trim per se is not unique to Lark. The particular zipper valance perhaps is unique to Lark.... But the point is that they have started out with the utilitarian structure that is virtually the heart and soul copy of the Pelavin invention contribution. And then they have compounded that injury by creating a medium for confusion.

That seems to be the point in the case where the patent infringement got tied, in the court's mind, to the unfair competition issue. The majority tacitly approves of this. I do not. Nor do I attribute this line of reasoning to the trial judge; he was merely persuaded to adopt it, ready made. The reasoning was and is CPG's. The record provides strong evidence of this. Before the trial started, the judge had wanted to know what counsel were going to do about providing him with proposed findings of fact and conclusions of law, indicating he liked to have them before trial. Plaintiff's counsel said he was accustomed in patent cases to providing them *after* the trial, rather than before. After hearing arguments at mid-trial from both sides on the defendant's motion for a "directed verdict" on Count II, § 43(a), mentioned above, and receiving a short memo, the court reserved decision overnight "until such time as I have made myself familiar with the cases that were cited ... in light of the fact that I am not as fully familiar with the cases that were cited as I would like to be...." Next morning both parties presented further argument and the judge denied the motion. The case then proceeded to its termination with defendant's evidence, concluded the same day.

During the closing argument by counsel for Pegasus on the Lanham Act § 43(a) issue, he was trying to make the point that there was no likelihood of confusion of purchasers *as to origin* by reason of the distinctly different identifications on the luggage of both parties, particularly the names and the LARK stripe, when the trial judge took him off on an entirely irrelevant detour:

THE COURT: —the fact that a customer might look at that luggage and not be confused as you suggest, does that stop one who is vending these items from bearing out some similarities and as a far example saying that this Lark Luggage costs a whole wheel of a lot more than this other luggage, let me show you this piece over here. What happens then? Is the likelihood of confusion there or can you distinguish this?

. . . .

MR. FRIEDMAN [defense counsel]: You're saying the individual salesman who then works in the department store?

THE COURT: Yes. I go to Sears to buy a $99 television that they advertised. I got there and the guy showed me the $285 television and why I should buy it. My understanding is if anybody ever bought the $99 one he would lose his job.

After this irrelevant example of typical "bait-and-switch" merchandising tactics, which have no bearing whatever on a § 43(a) issue or any other aspect of this case, counsel tried to explain to the judge that if such tactics *were* applied it would result in the customer buying LARK luggage because it is the more expensive make, not Pegasus. The court persisted:

THE COURT: I'll let you paint with that brush. But I have seen it a lot of different ways. Let me show you this dress over here, it is not one of those designer dresses but, you know, I'm a regular customer, I'm your buddy. Well, it is probably not important.

MR. FRIEDMAN: ... I can only say when the consumer sees a piece of luggage and that has as many differences as Pegasus versus the Lark, particularly with the Gucci stripe and particularly with the direct identification, it is pretty hard to say that Pegasus is not Pegasus or Lark is not Lark.... That is the key,

Your Honor, I think. And not to say that, don't buy Lark, buy Pegasus, or don't buy Pegasus buy Lark—

THE COURT: That's not my understanding of the law.

Counsel then concluded his argument with a statement that plaintiff had not sustained its burden of proving likelihood of confusion, pointing to the evidence of the many identifying differences between the packing cases, mentioning the extensive advertising of Pegasus luggage under its own name featuring its flying horse trademark, and concluded that there was little likelihood of confusion. The judge then concluded with these views which shed much light on his understanding of the issues (all emphasis mine):

THE COURT: If it was left to one thing, but it is not left to one thing, and I'm not being predisposed *because I really do not know just yet* until I hear from you all. You see it wouldn't be just actual confusion by itself. It has to do with whatever that likelihood is. And that case I was telling you teaches that. [*Original Appalachian Artworks* case.] *It's the likelihood of confusion that is the touchstone of patent infringement.* And it talks in terms of similarity of design, similarity of product, similarity of retail outlets, even when you talk in terms of them utilizing the same kind of thing. But that's another day. *I just am trying to learn,* that's all.

Plaintiff's counsel then made his closing argument on the patent aspects of the case and co-counsel rose to state that he would say nothing on the unfair competition count.

In due course, counsel on each side submitted proposed findings of fact and conclusions of law and plaintiff's submissions, as I discussed above, were essentially adopted by the court. The trial judge never wrote an opinion of any kind on any subject.

Under the circumstances of this all too prevalent practice (albeit forced on the courts by impossible workloads in many instances) of adopting highly partisan, counsel-drafted findings and conclusions, it behooves this court to at least consider them realistically for what they are and view them with a modicum of skepticism and caution.

### V.

The majority opinion, as I read it, seems to sanction *combining* the utilitarian with the non-functional features such as color, trim, and shape of trim to make out a case of § 43(a) trade dress falsification which would mislead the public as to origin, and to find intent to do so as well.

Under the law as I know it, functional or utilitarian features of a structure are *incapable of having* trademark significance. *In re Deister*, 289 F.2d 496, 129 USPQ 314 (CCPA 1961), and cases following it, too numerous to mention. Trademark significance means, simply, indicating origin or sponsorship. The trial court's findings rest *primarily* on the utilitarian features, contrary to that law.

I have carefully studied the *Harland* case, relied on by the majority, from which I have quoted earlier herein. There is nothing in that opinion to support what has been done here. In fact, the court in *Harland* made clear, as shown earlier herein, that "the second requirement for a trade dress infringement action" is "demonstrating that any features of the trade dress ... are 'primarily non-functional'." *Harland* was a jury case. The trade dress infringement issue went to the jury. The court said "functionality has been consistently treated as a question of fact." Therefore, the court held that it had to affirm the jury's verdict of trade-dress infringement if it was based on substantial evidence and the instructions were correct, as they were found to be. The trial judge had charged the jury that "the fact that the defendant utilizes functional features ... that are similar or even identical in some respects to functional features on plaintiff's ... product does not and cannot constitute unfair competition." He next charged that to establish its claim for trade dress infringe-

ment, "plaintiff must prove by a preponderance of the evidence that, (1), the design aspects or trade dress of Harland's ... product are *primarily* nonfunctional." (My emphasis.) He reiterated that statement no less than three times and then told the jury it had to determine whether the trade dress of Harland's product had acquired a secondary meaning. Nowhere did the trial judge or the Eleventh Circuit intimate that the presence of functional features such as a patented invention (a patent on a feature proving that it is at least prima facie functional, *Deister*, supra) can be "coupled" with non-functional features to create an infringing "total image." That unsound concept of law cannot be found in *Harland*.

The other Eleventh Circuit case cited by the majority is *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, supra, decided before and approved in *Harland*. Like *Harland*, it is no support for what was done here. Its trade dress aspects rest on the same basic legal principle that has *not* been complied with here, stated by the court as follows: "The essential element of an action under § 43(a) is proof by the plaintiff that the alleged infringement by the defendant creates a likelihood of confusion on the part of consumers as to the source of the goods." The "trade dress" situation there was unique and consisted of a merchandising scheme or sales technique devised by the plaintiff in connection with the sale of "soft-sculpture" dolls. Each doll was sold with "adoption papers" and a birth certificate. On the anniversary of sale, a birthday card was sent to the doll's purchaser. The buyer executed an "oath of adoption" and the doll received a personal name. Each doll's buttock was signed with a source indicator. Defendant appropriated this whole scheme, making only enough minor changes to provide something to argue about. The court of appeals held that the trial court's finding of infringement of "trade dress" which would create customer confusion, being a fact finding, was not clearly erroneous. There had, moreover, been evidence of actual confusion, as there had been in *Harland*,

which the court said was the best evidence of likelihood of confusion. *There is no such evidence in this case.* Most significantly, nothing in the case justifies the "coupling" of patent infringement with respect to purely functional or "utilitarian" features with non-functional features to sustain a holding of unfair competition.

The majority seems not to appreciate that its handling of the foregoing points completely unravels the district court's (i.e., LARK's) rationale in support of its holding of § 43(a) unfair competition. The majority says, in agreement with me, that patent infringement is "not the unfair competition envisaged in § 43(a)," that Pegasus is "not precluded from using black as a color, or tan leather trim, or a wide variety of shapes of trim." But the district court rested its decision of § 43(a) unfair competition on the combination of those very things: "LARK's color and trim in combination with its copying of LARK's unique functional concept" (finding J–4). The latter element it explained in finding J–2, first sentence, reading: "By reason of LARK's *patent rights* the *utilitarian* feature of crushable, deformable, light weight luggage is *unique* to the LARK PERMAMATIC construction." (My emphasis). It certainly treated the invention as an essential element of § 43(a) unfair competition whether or not the majority would do so. See conclusion E–1, supra.

## VI.

I forego any extended discussion of the injunction, paragraph "9" of the court's Dec. 14, 1983, Order, except to say there is nothing "carefully tailored" about it. I shall let the reader look at the injunction and at Plaintiff's Exhibit 21 and draw his own conclusions. If there are any reasonable limitations, they are to be found only in the majority opinion, which I find inconsistent with the injunction as written.

One last point. The injunction is *permanent.* It is based in major part on the flaw inherent in the findings of fact, namely, utilizing the *patent* infringement as a ma-

jor element of the § 43(a) decision. The patent will expire on May 1, 1990. Will the injunction based on unfair competition continue thereafter? Will Pegasus ever be able to make a packing case which "looks similar" to the 1700 Series?

## Conclusion

For all of the foregoing reasons, I respectfully dissent from the decision on Count II, the alleged unfair competition or § 43(a) issue.

APPENDIX

# BIG WHEN YOU NEED IT, SMALL WHEN YOU DON'T.

PLAINTIFF'S EXHIBIT 16

Unlike heavy, rigid luggage, the Lark Permamatic® gives you valuable extra room both on the road and back at home. The Permamatic shown here measures only 23x17x7¹/₂. But it can hold as much clothes, shoes, odds, ends and souvenirs as you can carry. And probably more. You can pack it full when you're traveling. Or fold it practically flat, out of the way, when you're not.

**No snap, crackle, pop.**

The Permamatic owes its great capacity and extra strength to its unique construction. A tough but pliant outer covering, coil spring frames and magnesium plates make it flexible, not rigid.

The Permamatic can handle all the things you usually pack at the start of your trip—and all the things you pick up along the way. With no popped locks. And no ripped zippers.

**The Permamatic can really take it.**

You can jump on it. Step on it. Kick it. Pound it. Crush it. Drop it. Or throw it. But you can't crack it, dent it or bend it out of shape. (About thè worst thing you'll be able to do to the Permamatic is crease it when you fold it. But that's a very small price to pay for so much convenience and durability. Anyway, creases come out eventually.)

**It packs some pleasant surprises.**

Outside, the Permamatic has a rugged heavy-duty, double-tab zipper. The tabs fit into a special lock. Snap the lock over the tabs and there's no way a would-be thief can tamper with the zipper.

Inside, you'll find a surprisingly luxurious lining. A snap-in accessory kit with two separate waterproof compartments. And special restraining straps that help keep your belongings from tumbling out when you open the bag for airline or customs inspections.

**The cost: much less than you think.**

People who know the price will think you're smart. Everybody else will think you're rich. The Permamatic comes in a variety of sizes, fine fabrics and elegant designs. All in all, an ideal gift for your favorite traveler. The choice is clear. Either you get luggage that's heavy and rigid, or you get the beautiful, soft, pliant and light Permamatic.

In other words, lug it . . . or Lark it.

## *Lark*® PERMAMATIC®

**LARK LUGGAGE CORP., Empire State Building, New York, New York 10001. Made in U.S.A.**

Copyright © 1973, Lark Luggage Corp. All rights reserved.

# LUGGAGE SERIES

PLAINTIFF'S
EXHIBIT
21

[PEGASUS]

Packing Cases of industrial nylon, trimmed in leather. These cases are specially designed with **reflex support material** so they always resume their former shape. Steel core center handle, removable, plastic lined inside pocket and tie tapes.

Black or Bronze with Tan Leather Trim

1722 W – 7", H – 13", L – 22"
1724 W – 7", H – 16", L – 24"
1726 W – 7", H – 16", L – 26"